ESTATE OF WILLIAM GOLDSTEIN, DECEASED, MAURICE STERN AND MATYE GOLDSTEIN, CO-EXECUTORS, AND MATYE GOLDSTEIN, SURVIVING WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60018, 60385.   Filed February 21, 1958.

*Maurice Stern, Esq.,*[1] and *Milton H. Stern, Esq.,* and *Bernard S. Berkowitz, Esq.,*[2] for the petitioners.

*Albert Squire, Esq.,* for the respondent.

---

[1] Counsel for petitioners in Docket No. 60018.
[2] Counsel for petitioners in Docket No. 60385.

932

TURNER, *Judge:* On the facts of record, decision must be against the Estate of Harry Goldstein and for the Estate of William, and for the respondent in the Harry Goldstein case and against him in the William Goldstein case.

From and after the death of their brother Charles, in 1949, Harry and William were equal and the only partners of L. Goldstein's Sons. Their association in the business was not harmonious, and almost continuously until the agreement of April 21, 1951, there were proposals and counterproposals for the incorporation of the business, its liquidation, or the purchase by one or the other of the partners of the other's interest.

The partnership agreement contained a provision requiring the settlement of disagreements with respect to the conduct of the partnership business or of its dissolution, by arbitrators, but, so far as appears, this provision was ignored by William and Harry. Dissolution was to be either by mutual agreement, or by written notice, given by any one partner to the other, at least 90 days prior to the date on which it was determined that the partnership be terminated, and during 1950 and 1951 Harry and William each gave one or more notices of dissolution to the other. But so far as appears, no steps were ever taken toward actual dissolution pursuant to any such notice, the usual result being a counterproposal from the other.

The last notice of dissolution appears to have been given by Harry to William on January 9, 1951. William responded on March 12. by an offer to purchase Harry's interest for $85,000. On April 5, Harry made a counterproposal to sell his interest for $100,000 net and for other specified considerations, as set forth in our Findings of Fact, including the provision that the purchasing partner should assume any tax assessments which might be levied against the individual members of the partnership. This proposal by Harry was rejected by William, and on April 12, William responded with a counteroffer, the terms of which are not shown of record.

The end result was the sale by Harry to William of his partnership interest for $125,000, pursuant to the agreement of April 21, 1951. The contention is made on behalf of Harry's estate that the negotiations and sale of his interest were based upon the business as it existed at January 1, 1951; that under the sale and the agreement with respect thereto the business became that of William at or as of January 1, 1951, and that Harry had no participation in the business as a proprietor from that date; that the business was that of William, and that Harry had no right to or interest in the profits from such date. In support of that position, it is argued that the logic of the situation requires the conclusion that no one would, under any circumstances, be willing to sell for $125,000 a partnership interest which in a period

of approximately 4 months would produce a profit of $72,584.42, particularly where the major part of such profit was to be accounted for in the $125,000 to be paid.

Beyond question, much of what transpired in the negotiations culminating in the April 21, 1951, agreement does not appear of record, and it may well be that the transaction as reflected by the written instrument was not what Harry desired or hoped for and that his reporting of income as he did was with a view to bringing the end results more in line with what he thought the transaction should have been, but we find no persuasive support of record for the conclusion that the instrument as executed did not reflect the agreement reached and did not fix and determine the terms of the sale and the rights of Harry and William with respect thereto.

On the facts as shown, it is patent that the partnership and the operation of the business thereof continued in full force and effect until it was terminated and ended by the April 21, 1951, agreement, and that up to that date, Harry was a full 50 per cent partner in every respect. The agreement contained nothing whatever to indicate that it was to relate back so as to take effect at a prior date, but to the contrary, it purports to and does in fact resolve the rights and liabilities of the parties as they existed at the date of the agreement. It was provided, for instance, that the business "*as presently carried on* by the copartnership shall cease," and that all business thereafter done should be at the risk and profit of William alone. (Emphasis supplied.) It was also provided that each of the partners should "pay such income taxes for past years *to the date of this agreement* which may be assessed against each of them by the Collector of Internal Revenue upon completion of his field survey of their accounts," and further, that William Goldstein, for himself or any successor, should give to Harry "such information as respects to the operation, assets and business of the partnership as Harry S. Goldstein may require for tax and other purposes *up to April 21, 1951.*" (Emphasis supplied.)

However unhappy Harry may have been with the terms of disposition of his partnership interest after the execution of the agreement, and however much his feeling may have been justified as between him and William, we find no basis in the evidence or under the law for any conclusion other than that he was a full partner in L. Goldstein's Sons up to April 21, 1951, and that his share of the partnership income, taxable to him as such for the said period, was as determined by the respondent. *United States* v. *Snow*, 233 F. 2d 103; *LeSage* v. *Commissioner*, 173 F. 2d 826; *George F. Johnson*, 21 T. C. 733; and *Louis Karsch*, 8 T. C. 1327. For cases where the result was to the contrary, see *Meyer* v. *United States*, 213 F. 2d 278, and *Swiven* v.

*Commissioner*, 183 F. 2d 656. In that connection, see and compare *B. Howard Spicker*, 26 T. C. 91, 99.

By the same token, the respondent erred in his determination of deficiency against William.

In view of the conclusion reached, it becomes unnecessary to consider and determine the income tax effect on the question herein of an agreement which would have related the sale of the partnership interest back to January 1, 1951, and made it as of that date. See and compare, however, *LeSage* v. *Commissioner*, *supra*, and *George F. Johnson*, *supra*.

Any adjustment in the computation of gain realized by Harry from the sale of his partnership interest to William which results from the respondent's determination of increased partnership net income for the period January 1 to April 21, 1951, will be given effect in the computations under Rule 50.

*Decisions will be entered under Rule 50.*